Filed 6/28/22  P. v. Lara CA4/2
Opinion after vacating opinion filed 5/17/21

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

DAVID DELEON LARA,

    Defendant and Appellant.

E074161

(Super.Ct.No. INF1501389)

OPINION

APPEAL from the Superior Court of Riverside County.  Randall Donald White, Judge.  (Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed as modified with directions.

Joshua L. Siegel, under appointment of the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys General, Daniel Hilton, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

In an information filed in March 2016, defendant and appellant David DeLeon Lara was charged with the murder of John Doe in 2011. (Pen. Code, § 187, subd. (a);[1] count 1.) Defendant was only 16 years old at the time of the murder. It was further alleged that defendant personally discharged a firearm in the commission of the murder (§ 12022.53, subds. (d), (e)), and intentionally killed John Doe under the special circumstance of lying in wait[2] (§ 190.2, subd. (a)(15)). Defendant was tried as an adult. In February 2019, a jury convicted defendant of first degree premeditated murder (§ 189, subd. (a)) and found the firearm and special circumstance allegations true.

Before the jury was empaneled, defendant waived his right to a jury trial on a gang allegation on the murder charge, and the court bifurcated the gang allegation to be heard at a later bench trial. After the jury returned its guilty verdict on the murder charge and found the firearm and special circumstance allegations true, defendant admitted the gang allegation as part of his guilty plea in another criminal case. (Riverside Super. Ct., No. RIF1704088.) Before sentencing, defendant moved to withdraw his admission, and the court denied the motion.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant's codefendant, Robert Parra, was charged in the same information with defendant, but he pled guilty to second degree murder before the jury was empaneled in what was to be a joint trial.

On November 1, 2019, defendant was sentenced to 50 years to life: consecutive terms of 25 years to life for the murder and the firearm enhancement.[3] The court expressly declined to exercise its discretion to strike the section 12022.53, subdivisions (d) and (e) firearm enhancement. (§ 12022.53, subd. (h).) Defendant did not ask the court to consider imposing a lesser term on a lesser firearm enhancement. (§ 12022.53, subds. (b) [personal use; 10 years] or (c) [personal discharge; 20 years].) Defendant was sentenced to seven years in prison in his other case. (Riverside Super. Ct., No. RIF1704088.)

On May 17, 2021, we issued a decision in this appeal. (*People v. Lara* (May 17, 2021, E074161) [nonpub. opn.].) Among other things, we rejected defendant's claim that the matter had to be remanded for resentencing so the court could consider whether to impose a lesser firearm enhancement on the murder charge. (§ 12022.53, subds. (b), (c).) We concluded that trial courts had no authority to impose lesser firearm enhancements that were neither charged nor found true, though we recognized there was a split of authority on the question.

---

[3] Because he was only 16 years old when he committed the murder, defendant was not sentenced to life without the possibility of parole (LWOP) for the murder based on the special circumstance finding, which otherwise would have mandated an LWOP sentence for the murder. (See § 190.5, subd. (b); *Miller v. Alabama* (2012) 567 U.S. 460, 465 [Eighth Amendment prohibits mandatory LWOP sentence for juvenile offender who commits homicide].) At sentencing, the court also noted there was "no consequence" to the gang enhancement on the murder conviction pursuant to *People v. Lopez* (2005) 34 Cal.4th 1002, 1006-1009 (A gang-related first degree murder, punishable by 25 years to life, is not subject to a 10-year enhancement under § 186.22, subd. (b)(1)(C); rather, under § 186.22, subd. (b)(5), the 25 year-to-life term is subject to a minimum 15-year parole eligibility date (MPED), but under § 190, subd. (e), a defendant has an MPED of 25 years on a 25-year-to-life sentence for first degree murder.).

Our Supreme Court granted review and later transferred the matter back to this court with directions to vacate our decision and reconsider the matter in light of *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*). In *Tirado*, our Supreme Court concluded that trial courts have discretion to strike section 12022.53 firearm enhancements in the interest of justice (§ 12022.53, subd. (h)) and to impose no punishment or punishment on a lesser section 12022.53 enhancement, if the elements of the lesser enhancement were alleged and found true (*Id*. at subd. (j); *Tirado*, at pp. 696-700 & fn. 13).

We vacated our May 17, 2021 decision on April 22, 2022, in accordance with the transfer order. Defendant then filed a supplemental opening brief, raising two additional claims in this appeal: (1) the matter must be remanded for resentencing so the court may exercise its discretion to strike his firearm enhancement (§ 12022.53, subds. (d), (e)), and impose either no punishment on any firearm enhancement or impose punishment on a lesser firearm enhancement under section 12022.53, subdivisions (b) [10 years] or (c) [20 years]); and (2) his waiver of his right to a jury trial on the gang allegation, and admission of the gang allegation in connection with his guilty plea in the other case, are no longer valid in light of Assembly Bill No. 333 (Stats. 2021 ch. 699, § 1, eff. Jan. 1, 2022) (Assembly Bill 333), which changed the elements necessary to prove a gang allegation.

In their supplemental respondent's brief, the People argue: (1) defendant forfeited his right to ask the court to exercise its discretion to impose a lesser firearm enhancement because, at his November 1, 2019 sentencing, his counsel did not ask the court to impose a lesser firearm enhancement but only asked the court to the strike the existing enhancement; and (2) defendant has not established grounds to overturn his jury trial

4

waiver to, and his admission of, the gang enhancement because he has not shown that the retroactive changes to the elements necessary to prove a gang enhancement, wrought by Assembly Bill 333, would have affected his waiver, admission, and plea.

We remand the matter for resentencing in light of *Tirado*. We agree with the People, however, that defendant has not established grounds to overturn his jury trial waiver to, and admission of, the gang enhancement allegation on the murder conviction. We reaffirm the holdings of our May 21, 2021 decision, to the extent these holdings are unaffected by the grant of review and transfer order.

That is, we reject defendant's claims that the trial court prejudicially erred in admitting statements into evidence against him—statements he made while he was incarcerated in another case in 2014 to two informants who were working as law enforcement agents—that he shot John Doe twice and admitting other details concerning the shooting. Defendant claims the admission of his statements to the informants both (1) violated his *Miranda*[4] rights because he had previously invoked his *Miranda* rights and refused to answer law enforcement officers' questions concerning the shooting; and (2) violated his due process rights because his statements were involuntary.

We find no merit to defendant's claims of *Miranda* and due process error. As we explain, a suspect's invocation of his Fifth Amendment right to counsel under *Miranda* does not preclude the admission of a confession and related statements that the suspect subsequently makes to persons whom the suspect is unaware are functioning as law

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

enforcement agents. (*People v. Orozco* (2019) 32 Cal.App.5th 802, 812-813 (*Orozco*).) The admission of defendant's statements also did not violate defendant's due process rights because the statements were voluntary under the totality of the circumstances.

We also reject defendant's claims that the trial court prejudicially erred in denying his motion to withdraw his admission of the gang enhancement allegation. The parties and we agree, however, that defendant is entitled to 196 additional days of presentence custody credits. (§ 2900.5.) Thus, we modify the November 1, 2019 judgment to award defendant 196 additional days of presentence custody credits, and we remand the matter for resentencing so the court may consider whether to exercise its discretion to impose a lesser term on a lesser firearm enhancement under *Tirado*, *supra*, 12 Cal.5th 688. We affirm the judgment in all other respects.

## II. BACKGROUND

A. *The September 20, 2011 Shooting*

On September 20, 2011, E.M. and her friend John Doe, whom she knew as D.J., met M.S. at a location where M.S. was remodeling a home. M.S. purchased a door from John Doe, and all three of them used methamphetamine. While E.M. and John Doe were still at M.S.'s workplace, two male Hispanic teenagers walked up to John Doe's white van and asked him to give them a ride to "Bitch Town" or "Browns Town," which was in Desert Hot Springs. E.M. identified defendant at trial as one of the two teenagers. John Doe, E.M., defendant, and the other teenager left in John Doe's van. John Doe was driving, E.M. was in the front passenger seat, and defendant and the other teenager squatted in the open back area of the van because there were no seats there.

6

While they were traveling in the van, E.M. received three phone calls from M.S., asking to speak to either one of the two teenagers, but neither would take the phone. M.S. later told deputies that he told E.M. that the teenagers, who were known as "G" and "Little Crazy," had a "beef" or a problem, and to pull the van over; but E.M. said that it was "too late." During the third call from M.S., E.M. handed the phone to John Doe, who listened to what M.S. had to say, then hung up the phone without saying anything.

Shortly after John Doe hung up the phone, the teenager who was with defendant told John Doe to "stop the car." John Doe stopped the van, and E.M. recalled that "everything got quiet." E.M. heard one gunshot, turned, and saw defendant hand a .45-caliber revolver to the other teenager. The rear doors to the van did not work, so the teenagers told E.M. to open the front passenger door in order to let them out of the van, and E.M. did so. E.M. saw that John Doe's "head was back," and he had been shot. Defendant and the other teenager told E.M. to run, and E.M. ran in one direction while defendant and the other teenager ran in the opposite direction.

E.M. went to a nearby house with an open garage and asked for help. E.M. was "terrified," said that her boyfriend had been shot in a white van, and pointed toward the van. E.M. also said that the person who shot her boyfriend was chasing her. One of the people who lived in the house where E.M. went for help heard two gunshots. Another person who was in his car and leaving for work also heard two gunshots; he then saw two Hispanic males walking behind his car, but he did not see their faces. Several people called the police or 911.

A Riverside County Sheriff's deputy responded to the scene, went to the van, and found John Doe inside with no pulse. The van was still running and in the drive position, and John Doe's foot was resting on the brake pedal. The passenger door was open, and no one was near the van.

An autopsy showed that John Doe died, within seconds or minutes, as a result of two gunshot wounds fired at close range in the right side of his neck. The gun used in the shooting was not found, and no shell casings or DNA were found inside the van. Defendant's fingerprints were also not found inside or on the outside of the van. Deputies interviewed various witnesses, including M.S. and E.M., both of whom had prior felony convictions.

M.S. told the deputies that the two teenagers who got into John Doe's van were known as "G" and "Little Crazy." Also before trial, M.S.'s stepdaughter, A.N., identified a photograph of defendant as "Little Crazy." E.M. told a detective that "G" was in the van and later identified defendant as the shooter; but E.M. initially identified a person other than defendant as the shooter. Both defendant and the person whom E.M. initially identified as the shooter had "Patricia" tattooed on their necks.

B. *The* "Perkins[5] *Operation*"

On August 19, 2014, detectives conducted what they called "a *Perkins* operation," in which they had defendant placed in a jail holding cell with two other individuals who were working as law enforcement agents or confidential informants, and to whom

---

[5] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

8

defendant made incriminating statements about the September 20, 2011 shooting. The informants were Hispanic former gang members, who had shaved heads and a lot of tattoos. The conversation between defendant and the informants was video- and audio-recorded, and it was monitored "live" by law enforcement officers. The recording of the conversation was played for the jury.

When defendant first entered the holding cell, one of the informants asked whether he was a "homie" and "active," and defendant said, "Yeah. I'm a homie—Crazy, from West Drive." The informants introduced themselves as "Rino" and "Lonely" and stated their gang affiliations. The three men discussed life in the prisons from which they had each been transferred.

After defendant was placed in the holding cell with the two informants, investigator Campos (the lead investigator of the Sept. 20, 2011 shooting) entered the cell. Campos addressed defendant, asked defendant whether he remembered him, identified himself as "Campos—doing the investigation on the 2011 murder [in] DHS," and told defendant he wanted to talk to him.

Defendant said he remembered Campos. Defendant was then removed from the holding cell to participate in a "mock" lineup—during which he was asked to step forward and turn around, which was intended to suggest to him that he was being identified, but no one was "behind the glass" to identify him.

After he was returned to the holding cell following the lineup, defendant told the informants that law enforcement had been trying to "get" him for a 2011 murder. He indicated he believed that he had been placed in the lineup because there were witnesses.

9

He also told the informants that he had previously been brought to the jail for a DNA test, and he did not tell detectives anything at that time.

The informants then asked defendant whether anyone could "put" him "there" or implicate him in the murder, and defendant said he had a "crimee" or cohort in the shooting named, "Gangster"; but he did not think that Gangster would implicate him. He also said that the murder occurred during the daytime, and Gangster was the only witness.

Later during the conversation, when asked whether he stabbed or shot John Doe, defendant said he shot John Doe in the "dome" with a "357" revolver. Still later, defendant said he had to step forward and turn around during the lineup. Thereafter, defendant said, "They do got me, dog. They got me." And, when asked whether he had gotten rid of the gun or "cuete" used in the shooting, defendant said, "they don't got none of that," but expressed concern that there was a witness to the shooting, whom he described as a "tweeker, heina, hooker bitch," who might be able to identify him.

Defendant explained he was sitting in a van, behind the woman, with Gangster next to him, when he shot John Doe twice in the head. The van was stopped at the time of the shooting. John Doe was not in a gang but was from "Browns Town," so defendant considered John Doe an "enemy" and the shooting "somewhat" gang-related. Defendant said, "It has to be that bitch" who was implicating him because he left no evidence behind. His gang had destroyed the revolver he used in the shooting, there were no cameras, and he had never talked about the shooting over the phone.

Before defendant spoke to the informants, the sheriff's department publicly released information about the shooting, but they had not publicly released any

10

information about where on his body the decedent was shot or that a female was in the van at the time of the shooting.

## III. DISCUSSION

A. *The Admission of Defendant's Statements to the Informants Did Not Violate Defendant's* Miranda *or Due Process Rights*

For two reasons, defendant claims the court prejudicially erred in admitting his statements to the two informants who were acting as law enforcement agents: (1) the statements were obtained in violation of his *Miranda* rights, given that he invoked his *Miranda* rights to Campos shortly before he made the statements to the informants; and (2) his statements were coerced and involuntary, and for this reason their admission violated his due process rights.

We independently review the trial court's legal determinations on these questions, and we uphold the court's underlying factual findings if supported by substantial evidence. (*Orozco*, *supra*, 32 Cal.App.5th at p. 811.) As defendant concedes, the operative facts are undisputed. Based on the undisputed facts, we find no merit to defendant's claims of *Miranda* and due process error.

### 1. Proceedings in Limine

Defendant moved in limine to exclude his recorded statements to the informants as violative of his *Miranda* rights and his due process rights. When he made the statements to the informants on August 19, 2014, defendant was serving a seven-year state prison sentence for robbery, but he had not been charged with any crime in connection with the September 20, 2011 shooting.

11

On August 19, 2014, defendant was transported from state prison to local custody, where he was placed in a holding cell with the two informants, whom the People acknowledged were "paid operators" or agents of law enforcement. Defense counsel proffered, and the court accepted, that defendant invoked his *Miranda* rights by telling Campos that he did not want to talk about the shooting and that he wanted an attorney, either before he was placed in the holding cell or when he was taken out of the cell to participate in the mock lineup.

As noted, the conversation between defendant and the informants was recorded and monitored "live" by Campos. The informants ultimately got defendant to admit to them that he shot John Doe twice in the head and to provide other details, not known to the public, concerning the shooting. The trial court ruled that, in light of *Perkins*, the admission of defendant's statements to the informants would not violate defendant's *Miranda* rights. The court also found that defendant's statements to the informants were voluntary, noting that there was "a conversational tone throughout" defendant's discussion with the informants, and "there did not appear to be any coercion" from defendant's perspective.[6]

---

[6] The court also found that the *Perkins* operation did not violate defendant's Sixth Amendment right to counsel, given that defendant had not been charged with a crime in connection with the shooting of John Doe before he was placed in the holding cell with the informants. (*Massiah v. United States* (1964) 377 U.S. 201, 204-206 [After a suspect has been charged with a crime, the government's use of an undercover agent to elicit incriminating statements from the suspect violates the suspect's Sixth Amendment right to counsel.].)

12

2. There Was No *Miranda* Violation

The Fifth Amendment, which applies to the states by virtue of the Fourteenth Amendment (*Malloy v. Hogan* (1964) 378 U.S. 1, 6), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself" (U.S. Const., 5th Amend). *Miranda* established the now familiar rule that any statements of a criminal suspect that stem from a custodial police interrogation are inadmissible against the suspect in the prosecution's case-in-chief, unless the suspect has been advised of certain rights—including the right to remain silent and to the presence of an attorney—and the suspect has expressly or implicitly waived those rights. (*Miranda*, *supra*, 384 U.S. at pp. 444-445; see *Dickerson v. United States* (2000) 530 U.S. 428, 443 ["*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture."]; *Orozco*, *supra*, 32 Cal.App.5th at p. 811 [summarizing *Miranda* rule and required *Miranda* warnings].) "*Miranda* was designed to protect and preserve an accused's Fifth Amendment privilege against self-incrimination during incommunicado interrogation of individuals in a police-dominated atmosphere." (*People v. Plyler* (1993) 18 Cal.App.4th 535, 544 (*Plyler*).)

*Perkins* limited *Miranda's* application by holding that a conversation between an incarcerated suspect and an undercover agent posing as a fellow inmate did not implicate the concerns underlying *Miranda*: "It is the premise of *Miranda* that the danger of coercion results *from the interaction of custody and official interrogation*. . . . When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his

listeners." (*Perkins*, *supra*, 496 U.S. at p. 297, italics added.) In other words, when a suspect is unaware that he is speaking with police or an agent of law enforcement, the coercive, police-dominated atmosphere of which *Miranda* was concerned is lacking, and *Miranda* advisements are not required. (*Perkins*, at p. 296.)

As defendant concedes, the operative facts are undisputed. Defendant was unaware that the two informants were acting as law enforcement agents when he confessed to them that he shot John Doe twice in the head and provided other details of the shooting. Thus, *Miranda* did not apply. That is, no *Miranda* warnings were required to be given to defendant before he was questioned by the informants, even if he was in custody for *Miranda* purposes at the time the informants questioned him. (Cf. *People v. Moore* (2011) 51 Cal.4th 386, 394-395 ["An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' "]; with *Maryland v. Shatzer* (2010) 559 U.S. 98, 11-14 [A suspect who is currently incarcerated for other crimes is not necessarily in custody for *Miranda* purposes.].) "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Perkins*, *supra*, 496 U.S. at p. 297.)

Defendant argues that *Perkins* does not govern his statements to the informants because *Perkins* "did not address surreptitious questioning of a suspect after the suspect had invoked his or her *Miranda* rights." Indeed, the defendant in *Perkins* did not invoke his *Miranda* rights, nor was he given any *Miranda* advisements, before he confessed to undercover agents that he had committed a murder. (*Perkins*, *supra*, 496 U.S. at p. 294-

14

295.) Defendant was also not advised of his *Miranda* rights before he was placed in the holding cell with the informants. But defendant invoked his *Miranda* rights to silence and to an attorney when he told Campos that he did not want to talk about the 2011 shooting, and that he wanted an attorney—before he confessed to the informants that he had shot and killed John Doe.

In support of his claim that *Perkins* does not govern, defendant cites *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), which held that a suspect's invocation of his *Miranda* right to counsel precludes "further police-initiated custodial interrogation," unless and until counsel is present or the suspect "initiates further communication" with the police. (*Edwards*, at pp. 484-485.) Defendant also relies on a statement by Justice Brennan that appears in a footnote to the justice's concurring opinion in *Perkins*: "Nothing in the Court's opinion suggests that, had respondent previously invoked his Fifth Amendment right to counsel or right to silence, his statements would be admissible. If respondent had invoked either right, the inquiry would focus on whether he subsequently waived the particular right. (See *Edwards v. Arizona* (1981) 451 U.S. 477; *Michigan v. Mosley* (1975) 423 U.S. 96, 104.) As the Court made clear in *Moran v. Burbine* (1986) 475 U.S. 412, 421, the waiver of *Miranda* rights 'must [be] voluntary in the sense that it [must be] the product of a free and deliberate choice rather than intimidation, coercion or deception.' (Emphasis added.) Since respondent was in custody on an unrelated charge when he was questioned, he may be able to challenge the admission of these statements if he previously had invoked his *Miranda* rights with

15

respect to that charge." (*Perkins*, *supra*, 496 U.S. at pp. 300-301, fn.* (conc. opn. of Brennan, J.).)

Defendant argues that the situation described by Justice Brennan in his concurring opinion in *Perkins* is precisely what happened in his case and that *Edwards*, not *Perkins*, governs his case. Citing *Edwards*, he argues that "further custodial interrogation outside the presence of counsel was prohibited" after he invoked his Fifth Amendment rights to silence and to counsel, and that "the relevant question here is whether [he] validly waived his rights to silence or counsel." This argument was thoroughly addressed and rejected in *Orozco,* where the court framed the question as follows: "When a suspect invokes his *Miranda* right to counsel [and silence] and law enforcement subsequently orchestrates a conversation between the suspect and someone the suspect does not know is an agent of law enforcement, which decision controls—*Edwards* or *Perkins*?" (*Orozco*, *supra*, 32 Cal.App.5th at p. 812.)

The defendant in *Orozco* confessed to his girlfriend that he had killed their infant child—without knowing his girlfriend was acting as an agent of the police—while the defendant was in custody and after he had invoked his *Miranda* right to counsel. (*Orozco*, *supra*, 32 Cal.App.5th at pp. 806-809.) For three reasons, *Orozco* concluded that *Perkins*, not *Edwards*, controls when a suspect makes statements to persons the suspect does not know are law enforcement agents after the suspect has invoked his *Miranda* rights.

*Orozco* first explained that language in *Edwards* and its progeny "dictate[d]" that *Edwards* did not apply. In sum, *Edwards* and its progeny applied *Edwards*'s prohibition

16

on further questioning of the suspect to "interrogation" of the suspect. (*Orozco*, *supra*, 32 Cal.App.5th at p. 813, citing *Edwards*, *supra*, 451 U.S. at pp. 478, 482, 484-486 and cases following *Edwards*.) "For purposes of *Miranda*, 'interrogation' means 'express questioning' or 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response.' " (*Orozco*, at p. 813, quoting *R.I. v. Innis* (1980) 446 U.S. 291, 300-301 (*Innis*).) "Whether the police action is 'reasonably likely to elicit an incriminating response' is judged by what the suspect perceives, not what the police intend. [Citation.] Implicit in the definition of 'interrogation' is that (1) the suspect is talking to the police or an agent of the police, *and* (2) the suspect *is aware* that he is talking to the police or one of their agents. This is why a suspect can be subject to 'interrogation' when he knowingly interacts with the police or their agents." (*Orozco*, at p. 813, and cases cited.) "Conversely, there is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police." (*Id*. at p. 814, and cases cited.) *Orozco* concluded that, "[b]ecause there is no 'interrogation' in these circumstances, there is also no basis to apply *Edwards*'s restrictions on further 'interrogation.' " (*Ibid*.)

Second, *Orozco* explained that the rationale underlying *Miranda* dictated that *Perkins*, not *Edwards*, controlled. The court noted that *Miranda* rights were "designed to dispel the 'compelling' 'psychological' 'pressures' that are part and parcel of 'in-custody interrogation.' " (*Orozco*, *supra*, 32 Cal.App.5th at p. 814, quoting *Miranda*, *supra*, 384 U.S. at pp. 448-449, 467.) Because the *Edwards* rule is based on the same pressures, and because *Edwards* implements *Miranda*, "so should" *Edwards* "be limited to the evil

17

*Miranda* was created to combat." (*Orozco*, at p. 814.)  Third, *Orozco* reasoned that California courts had "uniformly" and "not surprisingly" concluded that "*Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police." (*Id*. at p. 815, citing *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1540-1541 (*Guilmette*) [First Dist., Div. Four]; *Plyler*, *supra*, 18 Cal.App.4th at pp. 544-545 [First Dist., Div. Two].)

Defendant counters that *Miranda's* rationale "dictates" the conclusion that he was being subjected to police interrogation, in violation of *Miranda* and *Edwards*, when the informants questioned him about the shooting after he invoked his *Miranda* rights to silence and to counsel.  He relies on *Innis*, *supra*, 446 U.S. 291, where the high court expanded the definition of "interrogation," for *Miranda* purposes, to include "either express questioning or its functional equivalent.  That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any *words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response*." (*Innis*, at pp. 300-301, italics added.)

Based on *Innis*, defendant argues that "the officers' scheme of having [him] participate in the fake line-up and then placing him in a cell with confidential informants were '*actions on the part of the police*.' " (*Innis*, *supra*, 446 U.S. at p. 301, italics added.) He also argues that law enforcement officers knew, or should have known, that their "ploy" of having him placed in the cell with the informants, whose job was to get him to talk about the shooting, was " '*reasonably likely to elicit an incriminating response*.' " (*Ibid*., italics added.) These arguments are unavailing for two reasons:  (1) none of the

18

law enforcement officers involved in the "*Perkins* operation," including Campos, questioned defendant about the shooting after he invoked his *Miranda* rights to counsel and silence; and (2) defendant was not "interrogated" by the informants because he did not know that the informants were acting as law enforcement agents when they questioned him about the shooting. (*Orozco*, *supra*, 32 Cal.App.5th at pp. 813-814; *Perkins*, *supra*, 496 U.S. at pp. 296-297.)

Defendant argues that *Orozco*, *Plyler*, and *Guilmette* were wrongly decided and should not be followed. He specifically questions *Orozco's* interpretation of *Miranda*, and *Orozco*'s rationale that there is no "interrogation" unless the suspect knows he is speaking to agents of law enforcement. (*Orozco*, *supra*, 32 Cal.App.5th at p. 813.) He argues that *Orozco's* interpretation of "interrogation" is "not what the high court meant" when it "expounded upon" the definition of " 'interrogation' " in *Innis* as including "words or actions on the part of the police officers that they should know are reasonably likely to elicit an incriminating response from the suspect." (*Innis*, *supra*, 446 U.S. at pp. 300-301.) He argues that "plac[ing] a suspect in a cell with an undercover officer or informant for the purpose of eliciting incriminating statements from the suspect, as occurred here," amounts to " 'actions' that the officers at least '*should know are reasonably likely to elicit an incriminating response*.' " (*Id*. at p. 301.) Thus, he argues, *Orozco's* conclusion that there is no interrogation unless the suspect knows he is speaking to a law enforcement agent is "incorrect."

This argument misapplies *Innis* and disregards *Perkins*. Unlike *Perkins*, *Innis* did not involve an in-custody suspect's incriminating statements to persons whom the suspect

19

did not know were law enforcement agents. Rather, *Innis* involved police officers' statements while transporting a suspect to a police station, after the suspect was arrested for shooting a taxicab driver and invoked his *Miranda* rights to silence and counsel. (*Innis*, *supra*, 446 U.S. at p. 293-294.) At the time, the shotgun used in the shooting of the taxicab driver was missing. (*Id.* at p. 294.) On the way to the police station, two of the officers who were transporting the defendant began discussing between themselves that, because a school for handicapped children was nearby, one of the children might find the shotgun and hurt or kill themselves with it. (*Id.* at pp. 294-295.) The defendant then interrupted the officers' conversation, told the officers to turn the police car around, and showed police where the shotgun was located. (*Id.* at p. 295.)[7]

In expanding the definition of interrogation beyond express questioning to include its functional equivalent—that is, "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect"—*Innis* noted that "[t]he concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." (*Innis*, *supra*, 446 U.S. at pp. 299-301.)[8]

---

[7] *Innis* concluded that the officers' discussion about the shotgun in the defendant's presence did not amount to the "functional equivalent" of police questioning or interrogation. (*Innis*, *supra*, 446 U.S. at pp. 302-303.)

[8] *Innis* also pointed out that the "practices" that evoked this concern of *Miranda* included "several that did not involve express questioning" of the suspect by police. (*Innis*, *supra*, 446 U.S. at p. 299.) These included subjecting suspects to faux lineups, in

*[footnote continued on next page]*

*Perkins* similarly construed *Miranda* as "protect[ing] the Fifth Amendment rights of a suspect faced with the coercive *combination* of custodial status *and* an interrogation *the suspect understands as official.* On the other hand, even if a suspect happens to be in custody, '[t]here is no empirical basis for the assumption that [when] speaking to those whom he assumes are not officers, [he] will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess.' " (*People v. Tate* (2010) 49 Cal.4th 635, 685, quoting *Perkins*, *supra*, 496 U.S. at pp. 296-297.) Thus, defendant's reliance on *Innis* is misplaced. *Orozco* correctly concluded that *Perkins*, *not Edwards*, governs, and that no interrogation occurs when an in-custody suspect is questioned by and confesses to persons whom the suspect does not know are law enforcement agents. (*Orozco*, *supra*, 32 Cal.App.5th at pp. 813-815.)

Defendant correctly points out that courts "do not tolerate similar forms of deception" as was used to obtain his confession here, "when it comes to obtaining consent to police searches and seizures." (See, e.g., *Pagán-González v. Moreno* (1st Cir. 2019) 919 F.3d 582, 597 [FBI agents unlawfully gained access to the defendant's dwelling and computer by falsely telling him that the computer was sending viruses to government computers.]; *People v. Reyes* (2000) 83 Cal.App.4th 7, 9, 13 [The defendant was unlawfully searched, without a warrant or probable cause, after police lured him out of his home by falsely telling him they had accidentally hit his car.]; *People v. Reeves*

---

which the suspects were falsely identified in order to induce them to confess. (*Ibid.*) "It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation." (*Ibid.*)

(1964) 61 Cal.2d 268, 271 [Police unlawfully gained access to the defendant's hotel room by having a hotel manager falsely tell the defendant there was a letter for him at the front desk.].) Indeed, the high court has said that the Fifth Amendment right against self-incrimination and the Fourth Amendment right against unreasonable searches and seizures "enjoy an 'intimate relation' in their perpetuation of 'principles of humanity and civil liberty . . . .' [Citation.] They express 'supplementing phases of the same constitutional purpose—to maintain inviolate large areas of personal privacy.' " (*Mapp v. Ohio* (1961) 367 U.S. 643, 657, fn. omitted.) But *Perkins* held that *Miranda* warnings need not be given before an in-custody suspect is questioned by, and makes incriminating statements to, a person the suspect does not know is operating as a law enforcement agent. (*Perkins*, *supra*, 496 U.S. at p. 300.) We are not at liberty to adopt a rule that is inconsistent with *Perkins*.

3. Defendant's Statements Were Voluntary

Apart from his *Miranda* claim, defendant claims the admission of his statements to the informants violated his due process rights under the Fifth and Fourteenth Amendments because his statements were involuntary.

"Independent of whether a defendant's rights under *Miranda* were observed, his or her statements may not be admitted unless they were voluntary. 'The court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." ' " (*People v. Krebs* (2019) 8 Cal.5th 265, 299.) " ' A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " [Citation.] The test for determining whether a confession is

22

voluntary is whether the defendant's "will was overborne at the time he confessed." ' "
(*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347.) Whether a confession is
voluntary depends upon the totality of the circumstances surrounding the confession.
(*People v. Carrington* (2009) 47 Cal.4th 145, 169.)

" 'On appeal, the trial court's findings as to the circumstances surrounding the
confession are upheld if supported by substantial evidence, but the trial court's finding as
to the voluntariness of the confession is subject to independent review.' " (*People v.
Holloway* (2004) 33 Cal.4th 96, 114.) As we have noted, the operative facts concerning
the voluntariness of defendant's confession and other statements to the informants are
undisputed. The trial court found that defendant's confession and statements were
voluntary. On independent review, we agree.

As the trial court noted, there was a "conversational tone" throughout the
discussion between defendant and the informants in the holding cell. From defendant's
perspective, the informants did not appear to be coercing or pressuring defendant to
confess to the shooting or to make any other statements. (*Innis*, *supra*, 446 U.S. at p. 301
[Coercion is determined from the defendant's perspective.].)

Indeed, the informants only sporadically asked defendant about the shooting.
They also talked to defendant, and between themselves, about things other than the
shooting, including food, gang life, prison life, music, and sex in prison. The informants
often laughed with defendant.

Defendant argues that the law enforcement officers overseeing the *Perkins*
operation used "deception and manipulation" to get him to confess to the shooting

23

because they falsely led him to believe that he had been identified in the mock lineup before he confessed to the informants that he had shot John Doe. He notes that "[l]ies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession" if there is "a *proximate* causal connection between the deception or subterfuge and the confession." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240.) But such lies or deception "are not per se sufficient to make [a confession] involuntary." (*Ibid.*) Rather, the lies or deception must be " 'likely to procure an untrue statement.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 165; *People v. Thompson* (1990) 50 Cal.3d 134, 167 [discussing cases].)

The mock lineup, in which defendant was asked to step forward and turn around, was a deception, intended to make defendant believe he had been identified by a witness to the shooting and to prompt him to talk to the informants about the shooting. But the mock lineup, including the part in which defendant was asked to step forward and turn around in order to make him think he had been identified, was not likely to induce defendant to *falsely* confess to the informants that he shot John Doe, or to make any other false statements about the shooting.

Defendant further argues that the informants appeared to be "bigger, older gang members"; that the informants "barraged" him with questions about the shooting; and that his confession to the informants amounted to "jailhouse bravado." Again relying on Justice Brennan's concurring opinion in *Perkins*, he notes that "the pressures of custody make a suspect more likely to confide in others and to engage in 'jailhouse bravado.' . . . The State is in a unique position to exploit this vulnerability because it has virtually

24

complete control over the suspect's environment. Thus, the State can ensure that a suspect is barraged with questions from an undercover agent until the suspect confesses." (*Perkins*, *supra*, 496 U.S. at pp. 302-303 [conc. opn. of Brennan, J.].)

But, as noted, the informants did not "barrage" defendant with questions about the shooting. Rather, they intermittently asked defendant about the shooting while talking to him, and between themselves, about various things other than the shooting. When they talked to defendant about the shooting, the informants appeared to be trying to help defendant determine who might be able to identify him, and what other evidence the law enforcement officers may have had that would implicate defendant in the shooting. The informants were friendly and familiar with defendant and did not appear to be intimidating him. Under the totality of the circumstances, defendant's confession and other statements to the informants were voluntary, and not the product of coercion or an overborne will.

B. *The Court Did Not Abuse Its Discretion in Denying Defendant's Motion to Withdraw his Admission to the Gang Enhancement*

Defendant claims the court prejudicially erred and violated his due process rights in denying his motion to withdraw his admission of the gang allegation.[9] He claims his prior counsel rendered ineffective assistance of counsel in failing to advise him that his "appellate chances on the underlying jury verdict" would be "impaired" if he admitted the gang allegation. We find no error in the court's denial of the motion.

---

[9] Defendant obtained a certificate of probable cause. (§ 1237.5.)

25

### 1. Background

Before the jury was empaneled, defendant waived his right to a jury trial on the gang allegation, and the court bifurcated the bench trial on the gang allegation from the jury trial on all other charges and allegations. After the jury returned its guilty verdict on the murder charge and found the firearm and special circumstance allegations true, defendant admitted the gang allegation as part of his guilty plea in another criminal case (Super. Ct., Riverside, No. RIF1704088).

Before sentencing, and after new counsel was appointed to represent him, defendant filed a motion to withdraw his admission of the gang allegation on the ground his prior counsel had misadvised him of a direct consequence of the admission—namely, that the admission would "impair" his "appellate chances on the underlying jury verdict." The People filed an opposition to the motion. The court denied the motion following a brief hearing, at which the parties submitted on the motion and opposition papers. In denying the motion, the court noted, "it appears to the court that all of the proceedings [concerning the admission] were proper and appropriate."

### 2. Analysis

As relevant here, section 1018 provides that a court "may" permit a guilty plea to be withdrawn, and a plea of not guilty entered, "for a good cause shown," "any time before judgment." Section 1018 provides that it "shall be liberally construed" to effect its "objects and to promote justice." We review the denial of a motion to withdraw a plea for an abuse of discretion. (*People v. Patterson* (2017) 2 Cal.5th 885, 894.)

26

For purposes of section 1018, " ' "[g]ood cause" [to withdraw a plea] means mistake, ignorance, fraud, duress or any other factor that overcomes the exercise of free judgment and must be shown by clear and convincing evidence.' [Citation.] A defendant seeking to withdraw a plea based on the failure to advise on the direct consequences of a conviction must show actual ignorance of those consequences." (*People v. Dillard* (2017) 8 Cal.App.5th 657, 665 (*Dillard*).) Generally, " '[a] consequence is deemed to be "direct" if it has a " ' "definite, immediate, and largely automatic effect on the range of the defendant's punishment." ' " ' " (*Id*. at p. 664.) "The defendant also must show prejudice in the form of a reasonable probability that he or she would not have entered the plea had a proper advisement been given. [Citations.] A plea may not be withdrawn simply because a defendant has changed his or her mind." (*Id*. at p. 665.)

Here, the trial court did not abuse its discretion in denying defendant's motion to withdraw his admission of the gang enhancement allegation. Defendant's motion did not demonstrate good cause to withdraw the admission, actual ignorance of the consequences of the admission, or prejudice. In support of the motion, defendant adduced his own declaration, claiming only that his prior counsel failed to advise him that a "direct consequence" of his admission of the gang allegation would be "an impairment" of his "appellate chances on the underlying jury verdict." This statement was entirely too vague to constitute good cause for withdrawing the admission.

Indeed, defendant's declaration did not specify how his admission of the gang allegation would "impair" his "appellate chances on the underlying jury verdict." He also failed to show prejudice, or "a reasonable probability," that he would not have made the

27

admission had he been advised of these unspecified direct consequences of the admission. (*Dillard*, *supra*, 8 Cal.App.5th at p. 665.) Notably absent from defendant's motion was a declaration from his prior counsel regarding what advisements prior counsel gave defendant before defendant made the admission. And, although defendant's motion stated that he was not advised that he would be unable to appeal the gang enhancement, this assertion was not included in his declaration, and he does not assert this claim on appeal. As the People point out, defendant "fail[ed] to identify any direct consequences of which counsel failed to advise him, and therefore he cannot show the trial court abused its discretion or violated his rights to due process" in denying the motion to withdraw the admission.

Defendant claims that the withdrawal of his admission would not prejudice the People and suggests that the admission "only involved the gang enhancement." This is not the case. Defendant admitted the gang allegation as part of his plea in another pending criminal case after the jury returned its guilty verdict on the murder charge and its true findings on the firearm and special circumstance allegations in this case. Specifically, defendant agreed to admit the gang allegation, pled guilty to one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) in the other criminal case, and admitted a great bodily injury enhancement (§ 12022.7) in that other case in exchange for a seven-year sentence to run concurrently to his sentence in this case. In exchange, the People agreed to dismiss two other charges in the other criminal case along with prior conviction allegations. Thus, on this record, defendant has not shown that his admission of the gang enhancement was not voluntary, intelligent, and

28

made with full advisement of his constitutional rights and of direct consequences of the admission. (*Dillard*, *supra*, 8 Cal.App.5th at p. 664 ["A change of plea must be voluntary and intelligent, with a defendant being advised of his or her constitutional rights, and of the direct consequences of the conviction [or admission]."])

C. *Defendant Has Not Established Grounds to Vacate His Admission to the Gang Enhancement Allegation*

Defendant claims his waiver of his right to a jury trial, against self-incrimination, and to confront witnesses on the gang enhancement allegation, and his later admission of the allegation in connection with his guilty plea in his other criminal case, are "no longer valid"—that is, they can no longer be considered knowingly and voluntarily made, in light of the retroactive changes that Assembly Bill 333 made to section 186.22 and the facts or elements necessary to prove a gang enhancement allegation. (Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022.) Thus, he argues, the judgment must be reversed and the matter remanded to the superior court to allow him the opportunity to withdraw his admission to the gang enhancement along with his guilty plea in his other criminal case.

The People disagree. They point out that a defendant is deemed to be aware that the Legislature may change the law underlying an offense that is the subject of the defendant's plea bargain. Thus, in order to withdraw his admission or plea, defendant has to show more than that the law underlying his admission or plea changed; he has to show that the changes would have affected his decision to make the admission or enter into the plea, and defendant has not made this showing. We agree with the People.

29

1. Assembly Bill 333, Retroactivity

Assembly Bill 333 amended section 186.22 and added section 1109 to the Penal Code, effective January 1, 2022. (Stats. 2021, ch. 699, §§ 3-5.) The parties agree, and so do we, that Assembly Bill 333's ameliorative changes to section 186.22 apply retroactively to judgments not final on appeal on the bill's January 1, 2022 effective date. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343-344 [Substantive changes in Assembly Bill 333 apply retroactively because they "increase[] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement . . . ."]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 [same].) Because the November 1, 2019 judgment is not final (*People v. Vieira* (2005) 35 Cal.4th 264, 306), the bill's amendments to section 186.22 retroactively apply to the judgment.

2. Assembly Bill 333's Amendments to Section 186.22

Section 186.22 provides for enhanced punishment (gang enhancements) when an enumerated felony, including murder, was committed "for the benefit of , at the direction of, or in association with" a "criminal street gang. . . ." (§ 186.22, subd. (b).) Thus, the gang enhancement statute (§ 186.22, subd. (b)) cannot be violated unless the crime involved a "criminal street gang."

Assembly Bill 333 amended section 186.22 to change the definition of "criminal street gang." (Stats. 2021, ch. 699, § 3.) Section 186.22 formerly defined "criminal street gang" as "any ongoing organization, association, or group of three or more persons . . . whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added; Stats. 2017,

ch. 561, § 178.) The bill narrowed this definition to, "an ongoing, organized association or group of three or more persons . . . whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (Assem. Bill 333, § 3, revised § 186.22, subd. (f), italics added.)

The bill also changed the requirements for proving the " 'pattern of criminal gang activity' " necessary to establish the existence of a criminal street gang. Formerly, " 'pattern of criminal gang activity' " meant "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [predicate] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more [persons]." (Former § 186.22, subd. (e); Stats. 2017, ch. 561, § 178.)

Now, however, a " 'pattern of criminal gang activity' " requires proof of additional elements with respect to predicate offenses. (§ 186.22, subds. (e), (g).) The predicate offenses must have "commonly benefited a criminal street gang" and the common benefit must be "more than reputational." (§ 186.22, subds. (e)(1).) Examples of a common benefit that are "more than reputational" include but are not limited to "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g), enacted by Stats. 2021, ch. 699, § 3.) In addition, the most recent predicate offense must have occurred within three years of a charged offense, and the predicate offenses must have been committed on separate occasions or by two or more

31

gang members, as opposed to persons. (§ 186.22, subd. (e)(1).) The list of qualifying predicate offenses has also been reduced (*ibid.*), and the charged offense can no longer be used as a predicate offense (*id.* at subd. (e)(2)).

3. Analysis

Defendant claims it is "impossible to know" whether he "would still have admitted the gang enhancement" in February 2019, had he known that Assembly Bill 333 would make the retroactive changes that it made to section 186.22. As noted, he also claims his waiver of his constitutional rights to a jury trial, against self-incrimination, and to confront witnesses, which he made in connection with his admission, can no longer be considered knowing and intelligent. (See *Boykin v. Alabama* (1969) 395 U.S. 238, 243-244; *In re Tahl* (1969) 1 Cal.3d 122, 130-133.)

These arguments are unavailing. As the People point out, when a defendant admits a charge or enhancement in entering into a plea agreement, the defendant is *deemed to know* that the Legislature may change the definition of the offense or enhancement in the future. "[T]he general rule in California is that the plea agreement will be ' "deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws for the public good and in pursuance of public policy . . . ." ' " (*Doe v. Harris* (2013) 57 Cal.4th 64, 66, 70.) Defendant has not shown that his plea agreement is an exception to this general rule. That is, he has not shown that the facts and circumstances of his plea agreement give rise to an implicit promise that the plea agreement would be unaffected by changes in the law,

32

including changes in the elements necessary to establish a gang enhancement. (*Id.* at pp. 71-72.)

As the People argue, implicit in defendant's argument is the assertion that his plea agreement can only be considered knowing and intelligent if he knew, when he entered into the plea agreement, about the future changes and retroactive changes that Assembly Bill 333 would make to section 186.22. This assertion is both incorrect as a general proposition and is unsupported. (*Doe v. Harris*, *supra*, 57 Cal.4th at pp. 66, 71-72.) Although Assembly Bill 333 changed the elements necessary to prove a gang enhancement, defendant has not explained how these changes affected his admission of the gang enhancement or his willingness to enter into the plea agreement.

Thus, as the People argue, defendant's statement that "it is impossible to know" whether he would have entered into his plea agreement had he known that Assembly Bill 333 would retroactively change the elements of the gang enhancement does not help defendant's claim that the judgment must be reversed and his plea agreement vacated. It is actually fatal to the claim. It means he has not shown, and cannot show, that Assembly Bill 333 undermined either his knowing and intelligent *Boykin/Tahl* waivers or his willingness to enter into the plea agreement.

Relying on *People v. Eagle* (2016) 246 Cal.App.4th 275, defendant argues, "in these kinds of situations," where a new law was enacted while a case was pending, which changes the requirements for a charge or enhancement that the defendant previously pled guilty to or admitted, the defendant must be given the opportunity to withdraw the admission or plea. *Eagle* does not stand for this proposition. In *Eagle*, the defendant

pled no contest to transporting methamphetamine in violation of Health & Safety Code section 11379 along with another charge, admitted an enhancement allegation, and entered into a plea agreement. (*Eagle*, at p. 278.) Pursuant to the plea agreement, the trial court suspended the imposition of sentence and placed the defendant on three years' formal probation. (*Ibid*.) The Legislature later changed the definition of "transports" for purposes of Health and Safety Code section 11379, and the voters enacted Proposition 47. (*Id*. at p. 278.) The defendant then moved to vacate his felony conviction for transporting methamphetamine and to replace it with a misdemeanor conviction for possession of methamphetamine. (*Ibid*.)

The People and the *Eagle* court agreed that, because the defendant's judgment was not final, the defendant was entitled "to benefit retroactively" from the ameliorative changes to Health and Safety Code section 11379. (*Eagle*, *supra*, 246 Cal.App.4th at p. 279.) The court rejected the defendant's claim that his transportation conviction should be reduced to simple possession, given that simple possession was not a lesser included offense of transportation. (*Ibid*.) The court also ruled that, even if simple possession were a lesser included offense, the court could not simply reduce the transportation conviction to simple possession because, "[*w*]*hen a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand*." (*Id*. at p. 280, citing *People v. Figueroa* (1993) 20 Cal.Ap.4th 65, 71-72 & fn. 2 (*Figueroa*), italics added.) Such a retrial of the transportation charge, based on the new law, was not barred by double jeopardy clause or ex post facto principles. (*Eagle*, at p. 280.)

Defendant relies on the above-quoted, italicized language from *Eagle* in arguing the judgment must be reversed and his admission of the gang enhancement vacated in light of the retroactive changes Assembly Bill 333 made to section 186.22 and the elements necessary to prove a gang enhancement. *Eagle* is distinguishable, however, because it arose in the context of Proposition 47, which allows defendants to alter their plea agreements based on retroactive changes to the elements of various crimes. (*People v. Stamps* (2020) 9 Cal.5th 685, 702-703.) In *Eagle*, the People did not argue that the defendant was not entitled to the benefits of Proposition 47. Instead, the People argued, and the court agreed, that (1) simple possession was not a lesser included offense of transportation, and (2) although the transportation charge had to be vacated, the People were entitled to retry the transportation charge based on the new law.

As the People here point out, "the trouble with the *Eagle* decision lies in the unexamined conclusion (as a result of the People's concession) that *Eagle* should be allowed to withdraw his plea based on the definitional changes" in the transportation statute, Health and Safety Code section 11379. Proposition 47 does not apply here, and defendant has not established grounds to set aside his plea. As the People argue, "in cases such as the present where a subsequent change in the law does not necessarily or clearly impact plea considerations that would have been made prior to the amendments, the defendant must show not only that he did not anticipate such changes, but that also he would not have pleaded guilty [or there is a reasonable probability he would not have pleaded guilty] had the changes been in effect at the time." (See *People v. Dillard* (2017) 8 Cal.App.5th 657, 665.) Defendant has not made these showings here.

35

D. *Remand for Resentencing Is Warranted in Light of* Tirado

Defendant claims the matter must be remanded for resentencing so the sentencing court may consider, for the first time, whether to exercise its discretion to impose a lesser term on a lesser firearm enhancement under section 12022.53, subdivisions (b) (10 years) or (c) (20 years) in lieu of the 25-year-to-life term the court imposed for the greater firearm enhancement under section 12022.53, subdivisions (d) and (e). (*Tirado*, *supra*, 12 Cal.5th 688.) We agree that the matter must be remanded for resentencing.

We first address the People's claim that defendant forfeited his right to ask the court to impose a lesser firearm enhancement. We find no forfeiture.

The People argue defendant forfeited his right to ask the court to impose a 10- or 20-year lesser firearm enhancement because his counsel did not ask the court to impose a lesser enhancement; counsel only asked the court to strike the existing enhancement. (*People v. Scott* (1994) 9 Cal.4th 331, 351-356 ["Although the court is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing."].)

At sentencing on November 1, 2019, defense counsel asked the court to exercise its discretion pursuant to section 12022.53, subdivision (h) to strike the section 12022.53, subdivisions (d) and (e) firearm enhancement and impose "the minimum time allowed under the law." The minimum time allowed under the law would have been 25 years to life for the murder and *no additional term* for any firearm enhancement. The court declined to strike the firearm enhancement. It imposed sentence on the murder conviction, then said, "The Court will decline to exercise discretion pursuant to

36

12022.53(h) and impose an additional and consecutive term of imprisonment pursuant to 12022.53(d) and (e) of 25 years to life." Defense counsel did not ask the court to impose a 10- or 20-year term on a lesser enhancement. (§ 12022.53, subds. (b), (c).)

At the time of sentencing on November 1, 2019, there was a split of authority as to whether trial courts had discretion to impose sentences on lesser firearm enhancements that were neither charged nor specifically proved. In April 2019, the court in *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*) held that trial courts have this discretion, but in August 2019 another court disagreed with *Morrison* and held that trial courts did not have that discretion. (*People v. Tirado* (2019) 38 Cal.App.5th 637, 644, judg. vacated and cause remanded (2022) 12 Cal.5th 688.)

In addition to counsel's failure to ask the court to impose a lesser term on a lesser firearm enhancement, the People argue "the most" defendant can show is that "the law was unsettled" at the time of sentencing as to whether the court was authorized to impose a lesser term. The People argue, "it is reasonable to assume that defense counsel was well aware of the issue, yet he still declined to invoke the court's discretion" to impose a lesser firearm enhancement. We disagree that defense counsel forfeited the issue.

Although defense counsel could have asked the court to impose a lesser firearm enhancement under *Morrison*, one other court had expressly disagreed with *Morrison*. (*People v. Tirado*, *supra*, 38 Cal.App.5th at p. 644.) Thus, defense counsel may have reasonably believed that *Morrison* would not be followed. (See *People v. Gallardo* (2017) 4 Cal.5th 120, 128 [questioning whether defense counsel forfeited argument supported by United States Supreme Court precedent that did not "squarely overrule

37

existing California law"].)  Indeed, by January 2021, more than one year after defendant's November 1, 2019 sentencing, several additional courts, including this one, had issued published decisions disagreeing with *Morrison*.  (See *People v. Delavega* (2021) 59 Cal.App.5th 1074, 1084 [citing cases], judg. vacated (2022) ___Cal.5th___[2022 Cal.Lexis 2306].)

Further, even if the counsel forfeited the issue for defendant, that does not absolve this court of its discretion to consider it.  (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)  We exercise our discretion to consider the issue because it potentially affects defendant's substantial rights (§ 1259), namely, his now firmly established right, under California Supreme Court precedent, to ask the court exercise its discretion to impose a lesser term on a lesser firearm enhancement.  (*Tirado*, *supra*, 12 Cal.5th at p. 700.)

The record shows that remand for resentencing will not necessarily be futile. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 ["[I]f the ' "record shows that the court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required." ' "].)  To be sure, before it imposed sentence, the court recounted defendant's lengthy criminal history, the "large number" of factors in aggravation relating to both the murder and defendant, and the absence of any factors in mitigation relating to either the murder or defendant. Among other things, the court observed that defendant had been sentenced to state prison with a gang enhancement before he committed the murder and that he committed the murder only four months after he graduated from a youthful offender program.  The court also noted that "many programs and activities designed" for defendant's rehabilitation had been

38

"ineffective in curbing his criminality." The court imposed maximum $10,000 restitution and parole revocation fines. (§§ 1202.4, 1202.45.)

The People agree, however, that to the extent this court determines that defendant adequately preserved his claim, and we have determined that the claim was not forfeited, the matter must be remanded to allow the court to exercise its discretion to impose a lesser term on lesser firearm enhancements. As the People point out, "[g]iven the many factors in aggravation, and the lack of any factors in mitigation, the court may well decide to reimpose the original [25-year-to-life] term." Nevertheless, as the People and we also agree, "that is a decision for the trial court to make in the first instance on these facts."

E. *Defendant Is Entitled to 196 Additional Days of Presentence Custody Credits*

The parties and we agree that defendant is entitled to a total of 503 days of custody credits for the time he spent in local custody in this case, rather than the 307 days that he was awarded, or 196 days of additional custody credits. (§ 2900.5.)

A defendant is entitled to credit against a term of imprisonment for all days the defendant spent in local custody in the case for which he is sentenced, through the date of sentencing. (§ 2900.5; *People v. Denman* (2013) 218 Cal.App.4th 800, 814.)

At sentencing on November 1, 2019, defendant was awarded 307 total days of presentence custody credits under section 2900.5. The 307 days was ostensibly based on the probation report, which stated that defendant was entitled to custody credits under section 2900.5 from June 17, 2018, the date he was released on parole in an earlier case, through April 19, 2019, the original date he was to be sentenced in this case. (*People v.*

*Ayon* (1987) 196 Cal.App.3d 1114, 1117-1118 [defendant not entitled to custody credits under section 2900.5 for time the defendant was serving a sentence in another case, even though the defendant was concurrently under arrest for an unsentenced crime].) But the April 19, 2019 sentencing date was continued, and defendant was ultimately sentenced on November 1, 2019. Thus, defendants should have been awarded 507 days of presentence custody credits, from June 17, 2018 through November 1, 2019. (§ 2900.5.) We amend the judgment accordingly. (*People v. Jones* (2000) 82 Cal.App.4th 485, 493.)

## IV. DISPOSITION

The November 1, 2019 judgment is modified to award defendant a total of 503 days of presentence custody credits, 196 more than the 307 days he was awarded at sentencing on November 1, 2019. (§ 2900.5) The matter is remanded for resentencing, so the court may exercise its discretion whether to strike the 25-year-to-life term on defendant's firearm enhancement (§ 12022.53, subds. (d), (e), (h)) and impose a lesser term on a lesser firearm enhancement (§ 12022.53, subds. (b), (c), (j)) under *Tirado*, *supra*, 12 Cal.5th 688. We remand for *full resentencing* so as not to preclude the court from exercising its sentencing discretion in light of changed circumstances. (*People v. Buycks* (2018) 5 Cal.5th 857, 893 ["[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' "]; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant."].) Following resentencing, the court is further directed to prepare a supplemental sentencing

minute order, and an amended abstract of judgment, reflecting this court's and the trial court's modifications, if any, to the November 1, 2019 judgment.  In all other respects, the November 1, 2019 judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
Acting P.J.

We concur:

RAPHAEL _____
J.

MENETREZ _____
J.